# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CLAIRE'S STORES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 CV 2463 |
| vs. ) | |
| ) | Judge Joan H. Lefkow |
| COMPANION LIFE INSURANCE CO., ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Claire's Stores, Inc. ("Claire's") filed a five count complaint against defendant Companion Life Insurance Company ("Companion") for breach of contract (Counts II and V) and declaratory relief (Counts I, III and IV).[1] The complaint alleges that Companion failed to reimburse Claire's $768,562.96 in covered medical expenses pursuant to two stop loss insurance contracts: (1) the "Excess Loss Policy," effective from May 1, 2009 through April 30, 2010 (Compl. Ex. 1); and (2) the "Renewal Application," allegedly effective from May 1, 2010 through April 30, 2011 (Compl. Ex. 8). Companion has moved to dismiss all five counts under Federal Rule of Civil Procedure 12(b)(6) on the grounds that (1) Claire's did not timely pay or submit a claim for reimbursement for medical expenses during the term of the Excess Loss Policy; and (2) the Renewal Application did not create a binding contract. For the reasons stated below, the motion [#11] is granted.

---

[1] The complaint was originally filed in the Circuit Court of Cook County and then removed to this court.

## BACKGROUND[2]

Claire's offers a group health insurance plan for its employees and their dependents. Claire's pays claims under the plan to a certain amount, and then purchases stop loss insurance to limit its liability for potentially large claims. This case concerns two stop loss insurance policies allegedly purchased from Companion by Claire's and their applicability to an insurance claim submitted by a Claire's employee and her dependent.

**The Excess Loss Policy**

On May 1, 2009, Companion issued Claire's the Excess Loss Policy whereby Companion agreed to reimburse Claire's for certain eligible medical expenses incurred by covered employees (or their dependents) and Claire's agreed to pay premiums when due and comply with the policy's provisions. (Compl. Ex. 1.) Companion agreed to pay Claire's the "Specific Benefit," which was the amount of "eligible claims paid by [Claire's] over and above [Claire's] Specific Deductible Per Person" for the Specific Contract Basis. (*Id.* at 7.) Under the schedule of excess loss insurance section of the policy (the "Schedule"), the Specific Contract Basis was listed as follows:

> Specific Contract Basis: Employee Benefit Plan expenses must be:
> Incurred from 11/1/2008 through 4/30/2010.
> Paid from 5/1/2009 through 4/30/2010.

(*Id.* at 3.) The definition section of the policy defined the Specific Contract Basis as "the dates during which Employee Benefit Plan expenses must be Incurred *and* must be Paid to be

---

[2] Claire's is a corporation organized under Florida law with its principal place of business in Illinois. Companion is a corporation organized under South Carolina law with its principal place of business in South Carolina. The amount in controversy exceeds $75,000. Diversity jurisdiction therefore exists under 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1441(a).

considered eligible for reimbursement as Specific Benefits." (*Id.* at 7.) (emphasis added).[3] The benefits section also stated that

> The Specific Benefit with regard to each Covered Person was the total of the Eligible Claim Payments, on an Incurred *and/or* Paid basis as shown in Specific Contract Basis of the Schedule;
>
>     a.    less the Specific Deductible; and
>     b.    less amounts received from other sources;
>     c.    multiplied by the Specific Payable Percentage.
>
> The Contractholder shall not be entitled to any Specific Benefit unless and until the Contractholder has *actually Paid* the full amount of the Specific Deductible as set forth in the Schedule for Covered Person(s) for which the Specific Benefit is sought. The Contractholder shall only be entitled to a Specific Benefit up to the amount *actually Paid* by [the] Contractholder over and above the Specific Deductible.

(*Id.* at 8) (emphasis added). Pursuant to these provisions, Companion agreed to reimburse Claire's for covered claims within a reasonable time after receiving a fully executed proof of loss[4] and reasonably necessary documentation. (*Id.* at 11.) By providing a proof of loss, Claire's warranted that "all monies necessary to pay for services and supplies have been paid to the respective providers of medical services or supplies to which the claim for reimbursement relates." (*Id.*) Claire's paid all premiums required under the policy, and pursuant to its terms, the policy automatically terminated on May 1, 2010. (*See id.* at 12.)

---

[3] The Excess Loss Policy defined "incurred" as "the date on which a covered medical service was rendered, the date disability benefit payments became due, or a covered medical purchase was made for a Covered Person under the Employee Benefit Plan." (Compl. Ex. 1 at 6.) The policy defined "paid" to mean that "funds are actually dispersed by the Contractholder or his Agent. Payment of a claim is the unconditional and direct payment of a claim to a Covered Person or their health care providers. Payment will be deemed made on the date that both (1) the payor directly tenders payment by mailing (or otherwise delivering) a draft or check, and (2) the account upon which the payment is drawn contains, and continues to contain, sufficient funds to permit the check or draft be honored." (*Id.* at 7.)

[4] The Excess Loss Policy defined "proof of loss" as "the form authorized by [Companion] to be used for the submission of claims as well as the supporting documentation reasonably necessary for [Companion's] independent evaluation of the legitimacy and extent of the claim." (Compl. Ex. 1 at 7.)

**Renewal and Attempted Rescission of the Excess Loss Policy**

Prior to the expiration of the Excess Loss Policy, Claire's solicited a renewal bid from Companion for the May 1, 2010 through April 30, 2011 policy period. In April 2010, Companion, through its agent, ASG Risk Management, Inc. ("ASG"), submitted a quote to Claire's for the renewal of the Excess Loss Policy (Compl. Ex. 6) and Claire's submitted a Large Claim Report to Companion (Compl. Ex. 7). The large claim report listed all claims paid by Claire's in excess of $50,000 from March 2007 through April 2010. (*Id.*) On or around May 14, 2010, Companion sent Claire's an unexecuted application for renewal ("Renewal Application") for renewal of the Excess Loss Policy. (Compl. Ex. 8.) The Renewal Application Schedule stated that Companion would reimburse Claire's for eligible medical expenses incurred by a covered employee (or dependent) pursuant to the Specific Contract Basis as follows:

> Specific Contract Basis: Employee Benefit Plan expenses must be:
> Incurred from 5/1/2009 through 4/30/2011, *and*
> Paid from 5/1/2010 through 4/30/2011.

(*Id.* ¶ 8(e)) (emphasis added). Unlike the Excess Loss Policy, the Renewal Application did not contain a definition, benefits or claims provisions section. Moreover, the Renewal Application stated that it "must be accepted and approved by [Companion] . . . prior to any Contract being in existence," and that "this Application will be a part of the Contract if accepted by [Companion] or its authorized representative." (*Id.* at 1 & 4.) It also stated that

> Receipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability. In the event that Companion . . . disapproves this Application, its sole obligation shall be to refund such sum to the Applicant.

(*Id.* ¶ 11(e).)

4

On May 17, 2010, Claire's signed the Renewal Application (Compl. Ex. 9) and submitted its first premium payment, which Companion received on or about May 27, 2010. On or about June 15, 2010, Companion, again through its agent ASG, sent Claire's an Amended Application for Renewal ("Amended Application"), which revised the rates, deductibles, terms and conditions of the Renewal Application. (Compl. Ex. 10.) On or about June 21, 2010, Companion received Claire's June monthly premium pursuant to the Renewal Application. Companion returned Claire's premium payments for May and June to Claire's on or about July 6, 2010. On July 13, 2010, ASG informed Claire's that

> we have been unable to obtain a signed application for the Claire's Stores May 1, 2010 stop loss renewal. We had granted an extension to have the [amended] application signed up until July 8th, 2010. Since there has been no response from the employer or the broker, we are rescinding the stop loss renewal as of May 1, 2010 and returning any premium that had been submitted.

(Compl. Ex. 11.) On October 25, 2010, Companion told Claire's that its review committee stood behind its decision to rescind Claire's coverage. (Compl. Ex. 12.)

**The Insurance Claim at Issue**

The central dispute between the parties is whether and to what extent Companion is required to reimburse Claire's for expenses incurred by Claire's employee, Patient A, and her newborn dependent, Patient B, for medical care in connection with the premature birth of Patient B. Both Patients A and B were covered persons under the Excess Loss Policy. In February 2010, Patients A and B submitted a claim to Blue Cross Blue Shield of Illinois ("Blue Cross"), the third party administrator of Claire's group health insurance plan, for expenses incurred at UCSF Medical Center between November 7, 2009 and December 7, 2009. Blue Cross concluded that the amount of covered benefits was $139,920. Claire's paid this amount to UCSF

5

Medical Center on or about February 9, 2010, and Blue Cross submitted an initial notice of the claim to Companion and/or ASG. (Compl. Ex. 2.) The initial notice indicated that the total amount billed in connection with Patient A's and B's claim was $1,039,859.48. (*Id.*) In addition, Claire's submitted to Companion and/or ASG a specific excess loss 50% notification and preliminary notification of large claim that further advised Companion of the nature of the claim. (Compl. Ex. 3.)

On or about February 19, 2010, UCSF Medical Center submitted a final bill to Blue Cross Blue Shield of California for services provided Patient B from November 7, 2009 through February 1, 2010. Following an audit, UCSF Medical Center submitted a revised bill to Blue Cross, which determined that the total amount of covered benefits was $970,353.82. This included the $139,920 previously paid by Claire's. On or about May 27, 2010, Blue Cross submitted a second notice of the claim to Companion and/or ASG, stating that Claire's had made a second payment of $830,433.81 to UCSF Medical Center. (Compl. Ex. 4.) Claire's also submitted another excess loss 50% notification and preliminary notification of large claim to Companion. (Compl. Ex. 5.) On October 25, 2010, Companion reimbursed Claire's $26,790.85 on the claim, but denied Claire's remaining request for reimbursement. On the same date, Companion informed Claire's that its review committee had upheld its decision to deny Claire's claim for reimbursement. (Compl. Ex. 12.) Claire's then filed the instant complaint.

## LEGAL STANDARD

A motion to dismiss under Rule 12 (b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir. 1997). For the purposes of a Rule

6

12(b)(6) motion, the court takes as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *Jackson* v. *E.J. Brach Corp.,* 176 F.3d 971, 977–78 (7th Cir. 1999). Factual allegations must, however, be enough to raise a right to relief above the speculative level. *Bell Atlantic Corp.* v. *Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Thus, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). When ruling on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint and incorporated attached exhibits. *Universal Mortg. Corp.* v. *Württembergische Versicherung AG*, 651 F.3d 759, 763 (7th Cir. 2011).

## ANALYSIS[5]

In Counts I and II of the complaint, Claire's asks for a declaration that the Excess Loss policy required Companion to reimburse Claire's for eligible medical expenses incurred or paid prior to April 30, 2010 (Count I) and alleges that Companion breached the Excess Loss Policy by failing to reimburse Claire's for Patient A's and B's covered medical expenses (Count II). In Counts III, IV, and V, Claire's asks for a declaration that the Renewal Application created a valid and enforceable insurance policy (Count III), that Companion has not rescinded (Count IV), and that Companion breached by failing to reimburse Claire's for the claim at issue (Count V).

---

[5] The parties do not dispute that Illinois law governs the formation and interpretation of the agreements at issue. *See also* Compl. Ex. 1 at 1 ("This Contract Form is governed by the laws of the state of Illinois.")

## I. The Excess Loss Policy - Counts I & II

Companion argues that Counts I and II must be dismissed because the Excess Loss Policy unambiguously limited Companion's reimbursement liability to claims that were paid by Claire's during the contract period, and because Claire's paid $830,433.81 on the claim at issue after the Excess Loss Policy expired, it is not entitled to reimbursement.[6]

An insurance policy is a contract and therefore principles of contract interpretation apply. *Katz* v. *State Farm Mut. Auto. Ins. Co.*, --- N.E.2d ----, 2012 WL 398822, at *7 (Ill. App. Ct. Feb. 7, 2012). In determining whether a contractual ambiguity exists, the court must construe the contract as a whole. *Flora Bank & Trust* v. *Czyzewski*, 583 N.E.2d 720, 725, 222 Ill. App. 3d 382, 164 Ill. Dec. 804 (Ill. App. Ct. 1991). Under the "four corners rule," if the contract "is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over—no evidence outside of the contract may be considered." *Home Ins. Co.* v. *Chicago & Nw. Transp. Co.,* 56 F.3d 763, 767 (7th Cir. 1995) (citations omitted). When the provisions of a contract are subject to more than one reasonable interpretation, however, the contract is ambiguous and extrinsic evidence may be admissible to aid in ascertaining the intent of the parties. *Wald* v. *Chicago Shippers Ass'n*, 529 N.E.2d 1138, 1146, 175 Ill. App. 3d 607, 125 Ill. Dec. 62 (Ill. App. Ct. 1988). Whether or not a contract is ambiguous is a question of law for the court to decide. *Hubbard St. Lofts LLC* v. *Inland Bank*, --- N.E.2d ----, 2011 WL 6344377, at *7 (Ill. App. Ct. Dec. 13, 2011).

---

[6] Companion also argued that the Excess Loss Policy only extended to claims for which it received a fully executed proof of loss during the contract period. As highlighted by Claire's, however, the policy did not require the proof of loss to be submitted by a certain date.

8

Both parties argue that the Excess Loss Policy is unambiguous and that it supports their respective positions. Relying on the Schedule, which reads as follows, Claire's asserts that Companion agreed to reimburse Claire's for expenses incurred *or* paid through April 30, 2010.

> Specific Contract Basis: Employee Benefit Plan expenses must be:
> Incurred from 11/1/2008 through 4/30/2010.
> Paid from 5/1/2009 through 4/30/2010.

(Compl. Ex. 1 at 3.) According to Claire's, because the two reimbursement requirements – "incurred" and "paid" – are separated by a period, each of requirements is sufficient standing alone to trigger Companion's reimbursement obligations. *See McNally* v. *Am. States Ins. Co.*, 308 F.2d 438, 444 (6th Cir. 1962); *Blue Ocean Pres. Soc.* v. *Watkins*, 754 F. Supp. 1450, 1457 (D. Haw. 1991). Moreover, Claire's argues that to the extent the terms of the Schedule conflict with other provisions of the policy, the Schedule must control. *See Zurich Ins. Co.* v. *Walsh Constr. Co. of Ill., Inc.*, 816 N.E.2d 801, 806, 352 Ill. App. 3d 504, 287 Ill. Dec. 834 (Ill. App. Ct. 2004); *Nat'l R.R. Passenger Corp.* v. *Cont'l Ins. Co.*, 606 N.E.2d 434, 437, 238 Ill. App. 3d 643, 179 Ill. Dec. 602 (Ill. App. Ct. 1992); *Hannover Ins. Co.* v. *Dolly Trans. Freight, Inc.*, No. 6:05-CV-576-Orl-19DAB, 2006 WL 3842206, at *5 (M.D. Fla. Dec. 18, 2006). Claire's also points to the policy's benefits section, which states that "the Specific Benefit with regard to each Covered Person, is the total of the Eligible Claim Payments, on an Incurred *and/or* Paid basis, as shown in the Specific Contract Basis of the Schedule." (Compl. Ex. 1 at 8 (emphasis added)). As such, argues Claire's, the Excess Loss Policy unambiguously demonstrates that payment of a claim during the contract period was not required for reimbursement.[7]

---

[7] Claire's also relies on the Schedule contained in the Renewal Application to support its position that claims need not be paid during the contract period. (*See* Claire's Resp. at 8–9.) For the reasons
(continued...)

9

Companion argues that, viewed as a whole, the Excess Loss Policy clearly shows that a claim must be both incurred and paid prior to April 30, 2010 to be eligible for reimbursement. Companion points to the following contractual language to support its position: (1) the definition of Specific Contract Basis, which identifies the dates during which plan expenses must be incurred *and* paid to be eligible for reimbursement; (2) the definition of Specific Benefit, which included the amount Companion would reimburse Claire's for eligible claims *paid* by Claire's pursuant to the policy; (3) the language in the benefits section, which stated that Claire's was not entitled to any Specific Benefit until Claire's *actually paid* the full amount of the specific deductible, and that Claire's was only entitled to a Specific Benefit up to that amount *actually paid* by Claire's over the specific deductible; and (4) the language of the claims provisions section, which stated that upon presentment of the proof of loss, Claire's warranted that all monies necessary to pay for services and supplies had been *paid* to the respective providers of medical services.

The fact that the parties disagree about the terms of the Excess Loss Policy does not render the policy ambiguous. *Interim Health Care of N. Ill., Inc.* v. *Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000); *Flora Bank & Trust*, 583 N.E.2d at 725. Rather, "a contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to the term having a double or multiple meaning." *Markin* v. *Chebemma Inc.*, 526 F. Supp. 2d 890, 894 (N.D. Ill. 2007) (citation omitted); *Interim Health Care of N. Ill., Inc.*, 225 F.3d at 879.

---

(...continued)
discussed *infra*, the court declines to consider this evidence, which is extrinsic to the Excess Loss Policy.

Claire's points to the "and/or" language contained in the benefits section to support its position that reimbursement is not conditioned on payment of a claim. This section reads as follows:

> The Specific Benefit with regard to each Covered Person was the total of the Eligible Claim Payments, on an Incurred *and/or* Paid basis as shown in Specific Contract Basis of the Schedule;
>
>     a.    less the Specific Deductible; and
>     b.    less amounts received from other sources;
>     c.    multiplied by the Specific Payable Percentage.
>
> The Contractholder shall not be entitled to any Specific Benefit unless and until the Contractholder has *actually Paid* the full amount of the Specific Deductible as set forth in the Schedule for Covered Person(s) for which the Specific Benefit is sought. The Contractholder shall only be entitled to a Specific Benefit up to the amount *actually Paid* by [the] Contractholder over and above the Specific Deductible.

(Compl. Ex. 1 at 8) (emphasis added). When the first paragraph is read with the last, there is little doubt that Claire's must first pay the full specific deductible and the claim before it is entitled to a Specific Benefit from Companion.

Claire's also points to the Specific Contract Basis listed in the Schedule to support its position. Construing the Excess Loss Policy as a whole, however, the court agrees with Companion that the policy is not ambiguous. Rather, any uncertainty generated by the absence of the term "and" in the Schedule is clarified by resort to the definition section of the policy. This section defines "Specific Contract Basis" as "the dates during which Employee Benefit Plan expenses must be Incurred *and* must be Paid to be considered eligible for reimbursement as Specific Benefits." (Compl. Ex. 1 at 7) (emphasis added). Claire's attempts to overcome this definition by focusing solely on the terms of Schedule, but the court need not consider the Schedule in isolation from the remainder of the policy. *See Reserve at Woodstock, LLC* v. *City*

11

*of Woodstock*, 958 N.E.2d 1100, 1111, 2011 Ill. App. 2d 100676, 354 Ill. Dec. 904 (Ill. App. Ct. 2011) (A court may not ascertain the parties' intent "by viewing a clause or provision in isolation, or by looking at detached portions of the contract.") (citation omitted). Instead, the court must view each provision in light of the others, giving meaning and effect to the entire agreement. *Id.* Considering the Schedule in conjunction with the policy's definition, benefits, and claims provisions sections, any potential confusion regarding the parties' intent is eliminated. The policy repeatedly states that claims must be incurred and payment must be made prior to April 30, 2010, and the court concludes that the absence of the word "and" in the Schedule is insufficient to create an ambiguity as a matter of law.[8]

Finally, the interpretation advocated by Claire's would lead to an absurd result by allowing it to seek reimbursement for claims it had yet to pay. Given that not all incurred claims are actually paid, Claire's could receive a windfall if it were entitled to reimbursement for unpaid claims. *See generally Young* v. *Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 899 (N.D. Ill. 2009) ("courts do not look favorably on attempts to obtain windfall recoveries") (collecting cases). This reading would also reduce Claire's incentive to monitor and audit its employee's claims, an outcome that surely was not intended by the parties. *See, e.g., TAS Distrib. Co., Inc.* v. *Cummins, Inc.*, No. 07-CV-1141, 2010 WL 1797652, at *7 (C.D. Ill. May 5, 2010) ("[T]he Court is mindful that it should not interpret the contracts to reach an absurd result.") (citation omitted); *Sara Lee Corp.* v. *Daymark Group, Inc.*, Nos. 02 C 3427, 02 C 4277,

---

[8] Claire's position would strengthened if the Schedule contained the word "or" between the incurred period and the paid period. As it is, this provision is merely silent on the issue. Although silence may, in some circumstances, create an ambiguity, the court declines to find one here where other provisions of the policy are clear. *See Katz* v. *Am. Family Ins. Co.*, 516 N.E.2d 795, 796, 163 Ill. App. 3d 549, 114 Ill. Dec. 640 (Ill. App. Ct. 1987) ("A court should not invent an ambiguity where in fact none exists.") (citations omitted).

03 C 5929, 2004 WL 2966955, at *4 (N.D. Ill. Nov. 23, 2004) ("Courts will construe a contract reasonably to avoid absurd results.") (citation omitted). Given the clarity of the definition, benefits and claims provisions sections of the policy and the potential for Claire's interpretation to lead to an absurd result, Companion's motion to dismiss is granted as to Counts I and II.

## II. The Renewal Policy - Counts III, IV and V

In Counts III, IV and V of the complaint, Claire's seeks a declaration that the Renewal Application created a valid and enforceable insurance policy, that has not been rescinded, and damages for Companion's alleged breach of that policy. Companion argues that these counts must be dismissed because (1) Claire's and Companion did not reach a binding agreement; and (2) Companion did not manifest its assent to be bound by the terms of the Renewal Application by its receipt of Claire's June premium payment.

Under Illinois law, an agreement is typically enforceable where there has been an offer, an acceptance and a meeting of the minds as to the terms of the agreement. *City of Chicago* v. *Ramirez*, 852 N.E.2d 312, 324, 366 Ill. App. 3d 935, 304 Ill. Dec. 62 (Ill. App. Ct. 2006). The intent of the parties controls the question of whether a contract exists. *Conn. Gen. Life Ins. Co.* v. *Chicago Title & Trust Co.*, 714 F.2d 48, 50 (7th Cir. 1983). "In measuring intent, the court must consider all relevant circumstances surrounding negotiation and execution of the document, as well as the language of the document itself." *Id.* (citations omitted). "The test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Architectural Metal Sys., Inc.* v. *Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995) (citations omitted).

The general rule applied to insurance contracts is that "an application for insurance is the applicant's offer directed to the insurance company, not the other way around." *Martin* v. *Gov't Emps. Ins. Co.*, 565 N.E.2d 197, 202 n.1, 206 Ill. App. 3d 1031, 151 Ill. Dec. 926 (Ill. App. Ct. 1990) (explaining that after the applicant submits an application "[t]he insurance company normally assesses the underwriting risk from the application and therefore the insurance carrier must accept the applicant's offer before a contract is formed") (citation omitted); *see also* 16 Williston on Contracts § 49:38 (4th ed.) ("As a general proposition, the application or offer to purchase insurance does not become a contract unless and until it is accepted by the insurance company. Should the insurer refuse to issue a policy upon the terms specified in the offeror's application, there is no contract."). If the terms of the application are clear, the court need not consider extrinsic evidence to determine the parties' intent. *See Int'l Surplus Lines Ins. Co.* v. *Pioneer Life Ins. Co. of Ill.*, 568 N.E.2d 9, 11, 209 Ill. App. 3d 144, 154 Ill. Dec. 9 (Ill. App. Ct. 1990) ("if the language of the policy is clear and unambiguous, it will be applied as written") (citations omitted).

Here, the Renewal Application explicitly stated that it was subject to Companion's approval, stating that it "must be accepted and approved by [Companion] or its authorized representative prior to any Contract being in existence" and the it will become part of the contract only "if accepted by [Companion] or its authorized representative." (Compl. Ex. 8 at 1 & 4.) Claire's attempts to overcome this language by arguing that the Renewal Application contained all the applicable and relevant terms of coverage, which Claire's agreed to without revision, and as a result there was nothing left for the parties' to negotiate. Claire's position, however, is undermined by the fact that once Companion received Claire's completed Renewal

14

Application, it sent Claire's an Amended Application, which revised the rates, deductibles, terms and conditions of the Renewal Application. (Compl. Ex. 10.)

Claire's also relies on two out-of-state cases that are not binding on this court. *See Fritz* v. *Old Am. Ins. Co.*, 354 F. Supp. 514 (S.D. Tex. 1973); *Blumberg* v. *Paul Revere Life Ins. Co.*, 677 N.Y.S.2d 412 (N.Y. App. Div. 1998). Both are distinguishable from the facts of this case. In *Fritz*, the Southern District of Texas held that an application for life insurance coverage constituted an offer where the average layman would reasonably expect coverage to commence immediately upon completion of the application and payment of the premium. 354 F. Supp. at 518–19. In so holding, the court noted the "unique fact" that the defendant used the mail to solicit the plaintiff and as such, the plaintiff was forced to rely on the written application to understand the terms of the policy rather than the advice of an informed agent. *Id.* at 516. This fact, coupled with "the brochure's full description of the policy, the absence of a physical examination requirement, and the brevity of the application, [left] the impression that defendant [was] offering insurance which the individual [could] quickly and easily accept." *Id.* at 519. Thus, the plaintiff could reasonably expect that if he correctly filled out the application and mailed it, he was covered by the promised policy. *Id.*

In *Blumberg*, the New York court similarly applied the "reasonable expectations" exception to hold that an application for insurance constituted an offer. 677 N.Y.S.2d at 414. The defendant insurance company, through its agent, solicited the plaintiff to purchase disability income insurance. *Id.* at 413. The insurance application expressly stated that the policy was a "guaranteed issue" and "underwritting [was] waived." *Id.* It also stated that "coverage will be offered during the charter enrollment regardless of past medical history." *Id.* The plaintiff

15

completed the application and submitted a premium payment for the specified amount, but his application was denied. He then filed suit to enforce the provisions of the application.

In finding that the application constituted an enforceable contract, the New York court acknowledged that in some situations an insurance solicitation could form an offer and a completed application with the premium payment could constitute an acceptance. *Id.* at 414. "Such a situation arises where the soliciting literature spelled out the terms of the insurance, the scope of the insurance coverage, the intention of the insurer to accept applicants irrespective of their age or health, and nothing was left open to negotiations." *Id.* (citation omitted). Finding that the plaintiff "had a reasonable expectation that the policy would be approved," the court granted summary judgment in his favor and enforced the policy. *Id.*

There are a number of facts that make the present situation distinguishable from *Fritz* and *Bloomburg*. First, unlike the plaintiffs in both cases, Claire's is a sophisticated actor and therefore was better positioned to understand the terms and conditions of its coverage. Additionally, Claire's had a preexisting relationship with Companion and thus had the ability to ask Companion, or its agent, any questions it had pertaining to its coverage. In addition, unlike the insurance company in *Fritz*, which mass-marketed pre-approved policies through the mail, Companion generated a policy that was specific to Claire's based on information provided by Claire's. Finally, contrary to the solicitations in both *Fritz* and *Bloomburg*, the Renewal Application clearly stated that it must be accepted and approved by the provider prior to the formation of a contract. Although the Renewal Application set forth in detail the terms of the policy and the scope of coverage, it specifically stated that the application "must be accepted and approved by [Companion]" prior to the existence of a binding agreement, and Claire's points to

16

no express language that created an ambiguity as to this requirement. (Compl. Ex. 8 at 1.) As such, Claire's has failed to allege facts sufficient to show that the parties intended the Renewal Application to constitute an offer, which Claire's accepted through its written acceptance and first premium payment.

Nevertheless, Claire's argues that regardless of whether the Renewal Application constituted a binding contract, Companion accepted the terms of the application by receiving and accepting Claire's June 21, 2010 premium payment. In support, Claire's points to the following Renewal Application language:

> Receipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability. In the event that Companion . . . disapproves this Application, its sole obligation shall be to refund such sum to the Applicant.

(*Id.* ¶ 11(e).) This provision, argues Claire's, pertains only to the first premium payment and, as such, any subsequent payments accepted by Companion demonstrated its willingness to be bound by the terms of the Renewal Application.

One of the essential elements to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms. *Trittipo* v. *O'Brien*, 561 N.E.2d 1201, 1207, 204 Ill. App. 3d 662, 149 Ill. Dec. 505 (Ill. App. Ct. 1990). "The mutuality requirement is satisfied if each party has made a promise to the other and is therefore an obligor and under a duty to the other contracting party." *Piehl* v. *Norwegian Old People's Home Soc. of Chicago*, 469 N.E.2d 705, 706, 127 Ill. App. 3d 593, 83 Ill. Dec. 98 (Ill. App. Ct. 1984) (citation omitted). The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party. Restatement (2d) of Contracts § 22(a) (1981). Where an offeree takes the benefit of offered services with reasonable

17

opportunity to reject them and reason to know that they were offered with the expectation of compensation, however, the offeree's silence and inaction may operate as acceptance. *Id.* § 69(1)(a).

Claire's argues that the court should deny Companion's motion to dismiss because Companion manifested its assent to the terms of the Renewal Application by accepting a signed application from Claire's and accepting Claire's June premium payment. Claire's acknowledges that the Renewal Application stated that "[r]eceipt of a premium and its deposit in connection with the Application shall not constitute an acceptance of liability" (Compl. Ex. 8 ¶ 11(e)), but argues that only its first premium payment, received by Companion on May 27, 2010, was made "in connection with" the Renewal Application. Claire's subsequent payment, received by Companion on June 21, 2010, was not made "in connection with" the Renewal Application, states Claire's, but was made to satisfy Claire's June premium payment obligation. Companion did not return the May 27th and June 21st payments to Claire's until July 6, 2010. Claire's argues that by retaining its June 21st payment for over two weeks, Companion manifested its assent to be bound by the terms of the Renewal Application.

Assuming that Claire's completed Renewal Application constituted an offer, as argued by Claire's, acceptance through Companion's silence would be "exceptional" because "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." Restatement (2d) of Contracts § 69 cmt. a (1981). This is particularly true here where the Renewal Application stated that it "must be accepted and approved by [Companion] . . . prior to any Contract being in existence" and "[i]n the event that Companion . . . disapproves this Application, its sole obligation shall be to refund such sum to the Applicant." (Compl. Ex. 8 at 1

& ¶ 11(e); *see also id.* ¶ 11(a) ("[a]ll documentation requested by [Companion] must be submitted prior to any approval of this Application"); ¶ 11(c) ("[i]ssuance of the Contract is in reliance upon the information provided by the Applicant"); ¶ 11(d) ("[t]he Contract, if issued, may be void . . . [for] fraud"); ¶ 11(f) ("If a Contract is issued and later rescinded, the sum of all benefits paid will be deducted from the sum of all premiums paid."); 4 ("this Application will be a part of the Contract if accepted by [Companion]"). Companion never signed or approved the Renewal Application. Instead, pursuant to paragraph 11(e), it returned both of Claire's premium payments on July 6, 2010.

Moreover, prior to receiving Claire's June premium payment, Companion sent Claire's an Amended Application, which Claire's received but did not sign or accept. (*See* Exs. 10, 11.) Thus, even assuming that the Renewal Application constituted an offer by Claire's, the Amended Application was a counter-offer by Companion, which terminated Claire's offer. *See* Restatement (2d) of Contracts § 36(1)(a) (1981) ("An offeree's power of acceptance may be terminated by . . . counter-offer by the offeree."). Claire's theory of recovery proves too much. Companion's motion to dismiss Counts III, IV and V of the complaint is granted.

## CONCLUSION AND ORDER

For the foregoing reasons, Companion Life Insurance Company's Rule 12(b)(6) motion to dismiss [#12] is granted and the case is dismissed with prejudice.

ENTER:

Dated: March 7, 2012

_____
JOAN HUMPHREY LEFKOW
United States District Judge